Gilles Frozen Custard, Inc., a corporation v. Commissioner. Paul M. Gilles and Faythe S. Gilles v. Commissioner.
Gilles Frozen Custard, Inc. v. Commissioner
Docket Nos. 5550-67, 5551-67.
United States Tax Court
T.C. Memo 1970-73; 1970 Tax Ct. Memo LEXIS 287; 29 T.C.M. (CCH) 311; T.C.M. (RIA) 70073; March 26, 1970, filed Martin J. Torphy and E. Campion Kersten, 231 Wisconsin Ave., Milwaukee, Wis., for petitioners. Robert M. Burns, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against Gilles Frozen Custard, Inc. (hereinafter referred to as *288 petitioner) for the taxable years 1963, 1964, and 1965 in the respective amounts of $5,919.44, $5,707.80, and $8,424.36; and against Paul M. Gilles and Faythe S. Gilles for the taxable years 1963, 1964, and 1965 in the respective amounts of $264.11, $313.84, and $395.56. The respondent having conceded certain issues, those remaining for decision are: (1) whether petitioner may deduct as reasonable compensation amounts paid to Paul M. Gilles and Celia Gilles in 1963, 1964, and 1965; (2) whether an expenditure of $824.87 made by petitioner in 1963 constituted a deductible expense for repairs or a capital expenditure; and (3) whether amounts paid by petitioner to Paul Gilles in 1963, 1964, and 1965 as reimburseennt of expenses with respect to his automobile constituted deductible business expenses of petitioner or whether such amounts represented payment by petitioner of personal expenses of Paul Gilles and taxable income to him. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner is a Wisconsin corporation and at the time it filed its petition herein its place of business was located at 7515 West Bluemound Road, *289 Milwaukee, Wisconsin. It employed an accrual method of accounting. It filed its Federal income tax returns for the years 1963, 1964, and 1965 with the district director of internal revenue, Milwaukee, Wisconsin. Petitioners, Paul M. and Faythe S. Gilles, are husband and wife and resided in Brookfield, Wisconsin, at the time they filed their petition herein. They filed joint returns for the taxable years 1963, 1964, and 1965 with the district director of internal revenue, Milwaukee, Wisconsin. Faythe Gilles is a party to this proceeding only as a result of having filed joint returns with her husband during the years in question. The petitioner was organized on March 8, 1938, by Paul Gilles who has continuously served as its president. The original capitalization consisted of 520 shares of common stock of a par value of $10 per share. Paul Gilles owned 280 shares and his mother, Celia Gilles, owned 40 shares. The remaining shares were owned by 6 other individuals unrelated to the Gilleses. Thereafter Celia Gilles was issued 2 additional shares and Paul Gilles's wife, Faythe Gilles, was issued 1 share. In March 1963, Paul Gilles purchased 60 shares owned by C. Tonkin. The petitioner's *290 outstanding stock was held as follows during the greater part of 1963 and throughout the years 1964 and 1965: 312 Paul M. Gilles
340 shares
Celia Gilles
42 shares
Faythe Gilles
1 share
Paschale Shaffer
40 shares
Lester VanLuyk
50 shares
Lorayne Reiff
45 shares
Alice Haase 5 shares
Total
523 shares
Shaffer, VanLuyk, Reiff, and Haase are not related to the Gilleses. Since its organization petitioner has operated an independent drive-in frozen custard business in Milwaukee, Wisconsin. Throughout the years the business has been conducted at the same location. While the location was once in a relatively unpopulated area, during the years in question it was a part of a heavily populated neighborhood because of the city's growth. It was within 1 block of one high school, 6 blocks of another, and 12 blocks of still another. During the years in question petitioner operated both a retail and a wholesale business in frozen custard. Its drive-in was open for retail business from March 1 until Thanksgiving time. During the retail season the drive-in was open 7 days a week, from 10:30 a.m. until 12:00 p.m. Monday through Thursday, and from 10:00 a.m. until *291 12:30 or 1:00 p.m. on Fridays, Saturdays, and Sundays. Throughout the retail season petitioner sold a large variety of frozen custard products, 14 different sandwich items, and various beverages, the customers being served at the windows of the custard stand. Petitioner's principal product was a superior ice cream product which, pursuant to Wisconsin statute, was designated "frozen custard." In producing such custard petitioner used a purchased mix and utilized a machine which yielded 12 gallons of finished product for each 10 gallons of mix. Very few sellers of ice cream or frozen custard in the Milwaukee area utilized a mix, or produced a product, as high in quality as did the petitioner. During the retail season the drive-in was a popular meeting place for young people not only from the schools in the immediate area but also for those from schools throughout the city of Milwaukee, and 65 percent to 75 percent of petitioner's customers were teenaged. Because of the youthful make-up of its patronage, petitioner encountered substantial problems because of large crowds, traffic, noise, litter, and disturbances. During the retail season it was necessary for petitioner to have each *292 day approximately 18 to 20 employees working in split shifts. Because of employee turnover, the petitioner actually employed 38, 36, and 48 persons, respectively, during 1963, 1964, and 1965. The majority of employees in each year were new to petitioner's business and required training. Apart from Paul Gilles and Robert Linscott, the petitioner paid its employees wages which ranged from $1.40 per hour to $2.35 per hour. Petitioner's wholesale business, consisting of the production and sale of frozen custard, operated throughout the years in question and was heavier during the winter months when the retail business was closed. Petitioner had from 11 to 14 wholesale customers annually during the years in question. During the months the retail business was closed petitioner employed only 2 persons, Paul Gilles and Robert Linscott. Prior to the fall of 1963 the street upon which petitioner's drive-in was located was a minor east-west artery which served as the main road to Madison, Wisconsin, the state capitol. At that time an expressway south of petitioner's location was opened and the traffic flow past petitioner's drive-in dropped from approximately 24,000 cars a day to approximately *293 12,000 cars a day. Two franchised restaurants moved into the immediate neighborhood, one in 1962 and the other in 1964 or 1965. There are presently over 100 drive-in restaurants in Milwaukee. At one time all drive-ins in Milwaukee were independently operated. However, because of the growth of franchised drive-ins there are very few independent drive-ins remaining in Milwaukee. Petitioner's drive-in is one of the finest independent drive-in restaurants in the Milwaukee area. Through the years the petitioner's board of directors has been comprised as follows: 1938-1942 Paul M. Gilles, C. Tonkin and E.R. Reiff 1943-1957 Paul M. Gilles, Celia Gilles and E.R. Reiff 1958-1960 Paul M. Gilles, Celia Gilles and Lorayne Reiff 1961-1965 Paul M. Gilles, Celia Gilles, Faythe Gilles and Lorayne Reiff During the years in question Paul Gilles was petitioner's president, general manager and treasurer. Lorayne Reiff was petitioner's vice president. Her principal duties consisted of attending the annual directors' meetings. The only compensation she 313 received was $100 per year. Celia Gilles, Paul Gilles' mother, was petitioner's assistant treasurer. Throughout the years in question, *294 as in prior years, Paul Gilles was responsible for substantially every phase of petitioner's business. He was responsible for all hiring, training, and supervision of petitioner's employees; for purchasing materials and equipment used in petitioner's business; for maintaining order on the business premises; for dealing with problems arising because of petitioner's youthful patronage; and for all matters of general policy, such as petitioner's pricing policy and product-line. Throughout the retail season Paul Gilles devoted about 15 hours a day, 5 i/2 days per week, to petitioner's business. In addition to performing the above duties, he did maintenance and repair work on the business premises and the equipment used in the business, and he frequently worked at the counter, fountain and grill and in the manufacture of frozen custard. During the offseason his work included the manufacture of frozen custard for petitioner's wholesale customers, regular maintenance and repainting, cleaning and maintenance of equipment preparatory for the next retail season, and bookkeeping. In each of the years in question he devoted approximately 4,000 hours to the business of the petitioner. He did *295 not take any regular vacations and was never away from the business for any substantial length of time. Paul Gilles enjoys an excellent reputation as a businessman in the community, is wellknown to petitioner's customers, and petitioner's success is largely attributable to his efforts. Petitioner's sales in each year from 1938 to 1962 were as follows: Years
Sales
1938
$20,607.72
1939
27,701.55
1940
32,434.55
1941
52,171.30
Years
Sales
1942
$64,941.20
1943
52,051.66
1944
59,250.60
1945
50,022.69
1946
96,399.04
1947 117,678.30
1948
140,963.10
1949
137,108.31
1950
140,678.96
1951
150,470.13
1952
165,193.05
1953
172,853.23
1954 148,464.50
1955
152,707.47
1956
149,626.41
1957
157,170.01
1958
163,493.88
1959
165,297.62
1960
171,062.57
1961
185,593.97
1962
198,269.23
Petitioner reported sales, gross income, and taxable income during the years in question as follows: Sales
Gross Income
Taxable Income
1963
$223,886.84
$116,804.84
$7,962.35
1964
235,633.41
124,905.66
14,446.41
1965
242,082.35
128,129.73
4,962.87
Since its incorporation in 1938 and throughout *296 out the years in question the petitioner has paid total dividends of $74,076. [2] The book value of petitioner's stock was approximately $154 per share on December 31, 1963; $174 per share on December 31, 1964; and $178 per share on December 31, 1965. Its earned surplus was $75,282.77 on December 31, 1963; $85,651.25 on December 31, 1964; and $87,897.93 on December 31, 1965. It has not paid any dividends since 1958. In 1957 petitioner adopted a qualified pension plan, the funding of which *297 required a substantial amount of its earnings. Throughout the years in question the petitioner was considering a building program to expand its facilities. The program did not progress beyond discussions with an architect because petitioner lacked sufficient funds to initiate the program. 314 During the years in question Paul Gilles received the following amounts from petitioner in salary and bonus: [3]
Years
Salary
Bonus
1963
$24,000
$6,000
1964
24,000
6,000
1965
30,000
10,000
In January of each of these years a salary of $24,000 and a bonus of $6,000 were approved unanimously by petitioner's board of directors. The $6,000 increase in salary and the $4,000 increase in bonus in 1965 were *298 approved unanimously by petitioner's board of directors at a special meeting on December 28, 1965. These increases were granted in consideration of the good year enjoyed by petitioner in 1965 and in consideration of Paul Gilles' present and past services to petitioner. The fact that Paul Gilles did not receive any bonuses during the years 1957-1960 was also a consideration of petitioner's board of directors in approving the increases in his salary and bonus for 1965. During the years in question the petitioner made contributions to a qualified pension plan. Paul Gilles' share of such contributions was $5,304.78 for each of the taxable years 1963, 1964, and 1965. Petitioner also paid insurance premiums on his behalf in the amounts of $484.47 in 1963, $482.41 in 1964, and $477.56 in 1965. The total amount of compensation paid in the taxable years 1963, 1964, and 1965 by petitioner for the services of Paul Gilles (salary, bonus, insurance premiums, and pension plan contributions) and deducted by petitioner was as follows: 1963
$35,789.25
1964
35,787.19
1965
45,782.34
In the notice of deficiency addressed to the petitioner, the respondent determined that such *299 claimed deductions were excessive. He determined that a reasonable allowance for those years for salary or other compensation for the services of Paul Gilles (including pension plan contributions and insurance premium payments on his behalf) was $20,069.08, $20,071.30, and $20,005.18, respectively, and disallowed amounts claimed in excess thereof. Reasonable allowances for compensation (salary, bonus, insurance premiums, and pension plan contributions) for the taxable years 1963, 1964, and 1965 for services rendered by Paul Gilles are $30,000, $30,000, and $40,000 respectively. Celia Gilles operated the petitioner's business during the years 1942 through 1945 when Paul Gilles was in the armed services. Her responsibilities at that time were similar to those of Paul Gilles during the years in question, although the drive-in was not open as much during such former period. During the years in question her age was in the upper 70's. She has not actively participated in the work at the drive-in since 1946, although until 1953 she assisted Paul Gilles in keeping petitioner's books. Since 1953 her only activity has consisted of attending the annual directors' meetings and advising Paul *300 Gilles in regard to problems encountered in the business. The compensation which she received from the petitioner through the years was as follows: Years
Salary
Bonus
1942
-0-
-0-
1943
$ 900
-0-
1944-45
2,550
-0-
1946-49
1,200
-0-
1950-52
1,200
$100
1953-54
1,200
500
1955-65
1,800
500
The $600 increase in salary in 1955 was approved unanimously by petitioner's board of directors and was prompted by the consideration that her age would prevent her inclusion under petitioner's pension plan when it became effective. The amounts of $1,800 in salary and $500 in bonus paid by petitioner to Celia Gilles for the taxable years 1963, 1964, and 1965 were approved unanimously by petitioner's board of directors. In its income tax returns for each of the taxable years 1963, 1964, and 1965 the petitioner deducted as compensation paid to Celia Gilles the amount of $2,300. 315 In the notice of deficiency the respondent determined that for each of the taxable years in question the amount of $100 per year constituted reasonable compensation for Celia Gilles and disallowed as a deduction the amounts claimed in excess thereof. A reasonable allowance *301 for each of the taxable years 1963, 1964, and 1965 for salary or other compensation for services rendered by Celia Gilles is $700. Robert Linscott has been employed by petitioner for approximately 20 years. Throughout the years in question he acted as petitioner's assistant manager and his primary duties consisted of assisting Paul Gilles in the operation of petitioner's business. His workload was approximately 60 hour a week. During the years in question he received the following amounts from petitioner in salary and bonus: Year
Salary
Bonus
1963
$9,887.40
$1,000.00
1964
9,091.71
2,000.00
1965
9,393.70
2,500.00
The above amounts were claimed by the petitioner as deductions, and in the notice of deficiency the respondent raised no question with respect to the deductibility thereof. Petitioner's drive-in building has an aluminum canopy which, in the course of time, becomes oxidized. In 1963 petitioner paid $824.87 to have the canopy cleaned and coated with a plastic finish. Soap and water and an abrasive were used to clean the canopy after which the finish was applied with a brush. The work did not involve any alteration to structural parts of the *302 drive-in buildings, nor was it done to prolong its useful life. It was not part of a general remodeling or redecoration of the drive-in. The cleaning and application of the finish served only to maintain the drive-in building in an efficient operating condition. While the finish carried a 5-year guarantee to retain its appearance and protective properties, within 2 years after the work was completed the condition of the canopy was approximately the same as before such work was done. In its return for the taxable year 1963 petitioner claimed the amount of $824.87 as a repair expense. In the notice of deficiency the respondent determined that the above expenditure constituted a capital expenditure rather than a deductible expense, and allowed depreciation deductions for the years in question based upon an estimated useful life of 5 years. Throughout the years in question Paul Gilles used his automobile in connection with petitioner's business. Although no contemporaneous records were kept of the mileage driven for business purposes, it has been stipulated that the automobile was driven 3,545 miles in 1963, 3,169 miles in 1964, and 3,150 miles in 1965 in making deliveries of frozen *303 custard to petitioner's wholesale customers. During each of the years in question the automobile was also used to make retail deliveries, to transport merchandise and employees of petitioner, and to make trips to petitioner's bank and bookkeeper. During each of the years in question the automobile was also used by Paul Gilles to make trips to Chicago to attend dairy and restaurant conventions and for trips in 1964 to Highland Park and in 1965 to Waukegan to examine new equipment. In addition to its use for making wholesale deliveries, the automobile was used for the above-described business needs of petitioner to the extent of approximately 5,591 miles in 1963, 6,727 miles in 1964, and 7,036 miles in 1965. During the years in question the total mileage related to petitioner's business was approximately 9,136 miles in 1963, 9,896 miles in 1964, and 10,186 miles in 1965. Approximately 75% of this mileage was driven by Paul Gilles and the remainder was driven by other employees of petitioner. In the taxable years 1963, 1964, and 1965 the petitioner paid Paul Gilles the respective amounts of $1,100, $1,213.75, and $1,253.09 and in its returns deducted such amounts as representing reimbursements *304 of auto expenses incurred on behalf of the corporation. In the notice of deficiency, the respondent allowed petitioner $500 as auto expenses in each of the years 1963-1965 and disallowed the remainder with the notation that "it has not been established that the amounts in excess of amounts shown as being allowable constitute ordinary and necessary business expense or were expended for the purpose designated." In the notice of deficiency mailed to Paul and Faythe Gilles, the respondent determined that the disallowed portion of the automobile expense reimbursements constituted dividend income to Paul Gilles. Opinion The principal issue relates to the reasonableness of the amounts claimed by petitioner as deductions as compensation of Paul and Celia Gilles for the taxable years 1963, 316 1964, and 1965. Section 162(a) of the Internal Revenue Code of 1954[5] provides for the deduction of all ordinary and necessary business expenses, including a reasonable allowance for salaries or other compensation for personal services actually rendered. *305 The total amount of compensation paid to Paul Gilles (salary, bonus, insurance premiums, and pension plan contributions) and deducted by petitioner for those years was $35,789.25, $35,787.19, and $45,782.34, respectively. The respondent determined that a reasonable allowance for compensation of Paul Gilles for those years was $20,069.08, $20,071.30, and $20,005.18, respectively, and disallowed amounts claimed in excess thereof. The burden of proving the amount of reasonable compensation rests upon the petitioner. Clinton Co. v. Commissioner, (C.A. 7) 159 F. 2d 102, affirming a Memorandum Opinion of this Court. See also Walker v. Commissioner, (C.A. 7) 362 F. 2d 140, affirming a Memorandum Opinion of this Court and cases cited therein. The question of what constitutes reasonable compensation is one of fact to be determined from all the evidence. Huckins Tool and Die, Inc. v. Commissioner, (C.A. 7) 281 F. 2d 549, affirming a Memorandum Opinion of this Court; and Clinton Co. v. Commissioner, supra. Among the factors to be considered are the volume of the taxpayer's business, the experience, skill, and and qualifications of the *306 employee, the importance of the services which the employee performs, the amount of time the employee devotes to the business, the extent to which the employee's services contribute to the success of the business, and the standard of compensation for similar services in the industry. Consolidated Apparel Co., 17 T.C. 1570, aff'd. on this issue (C.A. 7) 207 F. 2d 580. In addition, in determining whether the compensation paid is reasonable, amounts paid or contributions made on behalf of the employee by the employer to a pension plan must be taken into account. Section 404 of the Internal Revenue Code of 1954 and the regulations thereunder. [6] See also Consolidated Apparel Co., supra further, it is also clear that payments by an employer of insurance premiums on behalf of an employee constitute compensation to the employee and 317 are to be considered in determining the reasonableness of the total compensation paid. Draper Co., 5 T.C. 822. *307 We have carefully considered all the evidence adduced in light of the above factors and have concluded that reasonable compensation of Paul Gilles (including salary, bonus, insurance premiums, and pension plan contributions) for each of the taxable years 1963 and 1964 is $30,000, and for the taxable year 1965 is $40,000. In reaching our conclusion we have accorded great weight to the fact that he acted as president, general manager, and treasurer of the petitioner and was responsible for substantially every aspect of petitioner's business, that he worked extremely long hours, and that the petitioner's success was largely due to his efforts. In addition, we have taken into consideration the testimony of a witness called by the petitioner and a witness called by the respondent, each of whom testified, in effect, that the salary and bonus paid in the years in question constituted reasonable compensation for the services rendered. We have also given some weight to the fact that although Paul Gilles, his mother, and his wife owned the controlling interest in the corporation during the years in question, the minority interest was represented on the board of directors and concurred in the *308 compensation paid. The total compensation paid Paul Gilles in those years and deducted by the petitioner exceeded the amounts we have found to be reasonable by the respective amounts of $5,789.25, $5,787.19, and $5,782.34, consisting of pension plan contributions and insurance premiums paid on his behalf. Since, in our opinion, the evidence adduced does not establish that greater amounts than found by us would constitute reasonable allowances as compensation of Paul Gilles, it is our conclusion that, in addition to the pension plan contributions and the insurance premium payments, the petitioner is entitled to deduct for the taxable years 1963, 1964, and 1965 no greater amounts than $24,210.75, $24,212.81, and $34,217.66, respectively. The petitioner claimed a deduction of $2,300 for each of the taxable years 1963, 1964, and 1965 as compensation of Celia Gilles, mother of Paul Gilles. Although during the taxable years in question she retained title of assistant treasurer, the fact is that she has not been active in that position since 1953. During the years in question she did attend annual directors' meetings and she did advise Paul Gilles in regard to problems encountered in petitioner's *309 business. However, there is no evidence in the record to establish that she rendered any services to the petitioner which would justify an allowance of $2,300 as compensation for her. The petitioner contends that she was undercompensated in the period from 1942 through 1945 when Paul Gilles was in the armed services. However, petitioner has failed to adduce proof of what her services were worth in those years. The respondent has allowed the petitioner a deduction of $100 for each of the years in question as reasonable compensation for her services, apparently for attending directors' meetings. We have concluded that an additional $600 per year would constitute a reasonable allowance for compensation for her. The record shows that she was voted a $600 increase in salary in 1955 because of the fact that, due to her age, she would not be eligible for the benefits of the petitioner's pension plan when it became effective. We think it clear, therefore, that the $600 was intended as retirement pay. Furthermore, considering her services to petitioner in prior years, it is our opinion that the amount of $600 paid in each of the taxable years 1963, 1964, and 1965 constituted a reasonable allowance *310 as compensation for her services in such prior years. The respondent determined that the amount of $824.87 paid by petitioner in the taxable year 1963 to have the canopy over petitioner's drive-in building cleaned and coated with a plastic finish constituted a capital expenditure rather than a deductible expense. We think the respondent erred in this respect. As pointed out in section 1.162-4 of the Income Tax Regulations, the cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but merely keep the property in an ordinarily efficient operating condition, may be deducted as an expense. See also Illinois Merchants Trust Co., 4 B.T.A. 103. While the plastic finish carried a 5-year guarantee, the evidence establishes that this work was not done to prolong the life of the drive-in building but only to maintain it in an efficient operating condition. Nor was the work a part of any general remodeling of the drive-in. In our opinion it did not materially add to the value of the drive-in building nor appreciably prolong its life. Accordingly, we hold that the amount of $824.87 is deductible for the taxable year *311 1963 as an ordinary and necessary business expense. 318 During each of the taxable years 1963, 1964, and 1965 Paul Gilles used his own automobile in making deliveries of frozen custard to petitioner's wholesale customers. It has been stipulated that in those years the automobile was driven for that purpose 3,545 miles, 3,169 miles, and 3,150 miles, respectively. The automobile was also used on behalf of petitioner to make retail deliveries, to transport merchandise and employees of petitioner, to make trips to petitioner's bank and bookkeeper, and to make other trips out of town on behalf of petitioner's business. No records were kept as to the mileage driven on behalf of the petitioner. Paul Gilles made certain estimates of the mileage driven for these additional uses on behalf of petitioner, but conceded that they were "rough" estimates. Under the circumstances we have exercised our best judgment, pursuant to the rule of Cohan v. Commissioner, (C.A. 2) 39 F. 2d 540, and, bearing against the petitioner upon whom rests the burden of proof, have found that the automobile was used for these additional purposes of petitioner to the extent of 5,591 miles in 1963, 6,727 *312 miles in 1964, and 7,036 miles in 1965. Therefore, the total mileage the automobile was driven on behalf of petitioner in 1963, 1964, and 1965 was 9,136, 9,896, and 10,186, respectively. For the taxable years 1963, 1964, and 1965 Rev. Proc. 64-10, 1964-1, (Part 1) C.B. 667, and Rev. Proc. 66-10, 1966-1 C.B. 622, provided that, in lieu of actual operating and fixed costs, the costs of operating an automobile for business purposes could be deducted if computed at a rate of 10" per mile for the first 15,000 miles of business use each year. Accordingly, petitioner is entitled to deduct for the taxable years 1963, 1964, and 1965 the respective amounts of $913.60, $989.60, and $1,018.60 paid by petitioner to Paul Gilles as reimbursement of costs of operating his automobile. The amounts which petitioner actually paid Paul Gilles as reimbursement for costs of operating his automobile in those years were $1,100, $1,213.75, and $1,253.09, respectively. The excess reimbursement paid in those years in the respective amounts of $186.40, $224.15 and $234.49 is not deductible by the petitioner. The respondent determined that to the extent amounts paid by petitioner *313 to Paul Gilles as reimbursement exceeded his costs of operating the automobile on petitioner's behalf, such excess constituted dividend income to Paul Gilles. We agree. Such excess reimbursement represented payments by petitioner of the personal expenses of Paul Gilles. In view of the fact that petitioner had sufficient earnings and profits, we accordingly hold that Paul Gilles was in receipt of dividend income in each of the taxable years 1963, 1964, and 1965 in the respective amounts of $186.40, $224.15 and $234.49. See Irving Sachs, 32 T.C. 815, affd. (C.A. 8) 227 F. 2d 879, certiorari denied 364 U.S. 833, and cases cited therein. Decisions will be entered under Rule 50. Footnotes
2. Throughout its history, petitioner has paid dividends as follows: ↩
Years
Total Divi-
Outstanding
Dividends
Paid
dends Paid
Shares
per share
1939
$ 520.00
520
$ 1.00
1940
1,820.00
520
3.50
1941
2,860.00
520
5.50
1942
520.00
520
1.00
1943
1,560.00
520
3.00
1944
2,600.00
520
5.00
1945
2,600.00
520
5.00
1946
5,220.00
522
10.00
1947
5,220.00
522
10.00
1948
$ 7,830.00
522
$ 15.00
1949
10,440.00
522
20.00
1950
10,440.00
522
20.00
1951
10,440.00
522
20.00
1952
10,440.00
522
20.00
1953 -0-
522
-0-
1954
-0-
522
-0-
1955
1,305.00
522
2.50
1956
-0-
522
-0-
1957
-0-
522
-0-
1958
261.00
522
.50
3. Prior to the years in question, Paul Gilles received the following amounts from petitioner in salary and bonus: ↩
Years
Salary
Bonus
1938
$ 1,610
-0-
1939
2,420
-0-
1940-43
3,000
-0-
1944-45
4,000
-0-
1946
10,000
-0-
1947
10,000
$ 2,500
1947
10,000
$ 2,500
1948
12,500
2,500
1949
15,000
2,500
1950-52
15,000
3,500
1953
15,000
15,000
1954-56
24,000
6,000
1957-60
24,000
-0-
1961-62
24,000
6,000
5. Section 162(a) provides in part as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; Section 1.162-7 of the Income Tax Regulations provides in part as follows: Compensation for personal services. (a) There may be included amoung the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. Section 1.162-9 of the Income Tax Regulations provides in part: Bonuses to employees. Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. * * *↩
6. Section 404 provides in part as follows: DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN. (a) General Rule. - If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section * * * Section 1.404(a)-1(b) of the Income Tax Regulations provides in part as follows: In order to be deductible under section 404(a), contributions must be expenses which would be deductible under section 162 (relating to trade or business expenses) or 212 (relating to expenses for production of income) if it were not for the provision in section 404(a) that they are deductible, if at all, only under section 404(a). Contributions may therefore be deducted under section 404(a) only to the extent that they are ordinary and necessary expenses during the taxable year in carrying on the trade or business or for the production of income and are compensation for personal services actually rendered. In no case is a deduction allowable under section 404(a)↩ for the amount of any contribution for the benefit of an employee in excess of the amount which, together with other deductions allowed for compensation for such employee's services, constitutes a reasonable allowance for compensation for the services actually rendered. What constitutes a reasonable allowance depends upon the facts in the particular case. * * *